SUSAN ECKLEY, Plaintiff-Appellant, *v.* ST. THERESE HOSPITAL *et al.*, Defendants-Appellees.

Second District    No. 75-365

Opinion filed July 24, 1978.

Arnold & Kadjan, Sidney Z. Karasik, and Barry P. Goldberg, all of Chicago, for appellant.

Edward A. Puisis and Robert Snook, both of Hall, Meyer, Fisher, Holmberg & Snook, and Snyder, Clarke, Dalziel, Holmquist & Johnson, both of Waukegan, for appellees.

Mr. JUSTICE NASH delivered the opinion of the court:

Plaintiff, Susan Eckley, brought this action against St. Therese Hospital and seven physicians, defendants herein, for damages allegedly caused by their negligent care and treatment of her. Prior to trial she entered into a loan-receipt agreement with two of the defendants, Dr. S. I. Sipos, Jr., and Dr. Nathan Tolwinsky, and they were dismissed from the case. At the close of plaintiff's evidence, the trial judge directed a verdict in favor of the hospital and four of the remaining physician defendants and allowed the case to be submitted to the jury only as it concerned Dr. Benjamin Pessis. The jury returned a verdict for that defendant and plaintiff appeals.

Plaintiff contends: (I) that the trial court improperly directed verdicts in favor of certain defendants; and (II) that trial error entitling her to a new trial occurred as follows: that the trial court improperly advised the jury of the death of a defendant's wife; that the court permitted improper use of the loan-receipt agreement in argument; that the court erred in permitting the defense to call Dr. Robert Hoffman as an expert witness

and unduly restricted plaintiff's examination of witnesses; that the court improperly failed to impose sanctions for defendants' failure to abide by discovery orders; that plaintiff was prejudiced by the trial court's refusal to allow photographs of her scars to be submitted to the jury; and that the trial court abused its authority in requiring plaintiff's counsel to submit to the court and defense counsel copies of the hypothetical facts plaintiff proposed to present to its expert medical witness. Plaintiff also contends that the remaining 68 points of error raised in her post-trial motion, but not argued in her brief, should be considered on appeal.

Plaintiff, a married woman 28 years of age, first consulted with Dr. Tolwinsky on September 3, 1971, regarding symptoms associated with pregnancy for which he prescribed a medication. On October 3 she had a miscarriage at her home and was admitted to St. Therese Hospital in Waukegan. Dr. Tolwinsky was not in town and she was attended by his partner, Dr. Sipos, a gynecologist, who examined her and diagnosed an incomplete abortion. On October 4, Dr. Sipos performed a surgical procedure known as a dilation and curettage in an effort to control the uterine bleeding caused by the miscarriage.

In the course of the surgery Dr. Sipos ran a surgical instrument known as a curet through the wall of plaintiff's uterus and into her abdominal cavity. It lacerated connecting tissues and damaged the small bowel. In withdrawing the curet Dr. Sipos pulled the bowel out of the vagina then pushed it back through the hole in the uterus and into the abdominal cavity with forceps. Realizing he was not qualified to repair the injuries to the bowel, Dr. Sipos summoned Dr. Pessis, who was a member of the hospital · staff and fully qualified to diagnose and perform abdominal surgery. The two doctors worked together with Dr. Pessis undertaking repair of the bowel while Dr. Sipos repaired the injuries to the uterus and thereafter plaintiff was placed on antibiotics and a soft diet. She remained in the hospital until her discharge on October 16, during which time no untoward symptoms were noted except a partial obstruction of the bowel which subsided without treatment. That condition developed at a time after she had received roast beef with a hospital meal on the fourth or fifth day following surgery.

On October 25, after she had been home for a week, plaintiff experienced discomfort in her lower stomach. She called Dr. Tolwinsky's office and an appointment was made for her to see Dr. Sipos later that day. While awaiting that appointment she also attempted to reach Dr. Pessis and was informed by his associate, Dr. Victor Steiner, that they could not see her and to see her gynecologist. She kept her appointment with Dr. Sipos later that day and on examination he stated he found nothing wrong and she returned home with a prescription for medication and directions to minimize her activities and to rest.

On the night of November 8 and early morning of November 9 plaintiff was examined in the hospital emergency room after she experienced severe pain in her abdomen. Neither Dr. Sipos nor Dr. Tolwinsky was available and she was examined by Dr. Steiner, the associate of Dr. Pessis, who happened to be in the hospital. On examination Dr. Steiner found evidence of some type of a pelvic infection, prescribed an antibiotic and advised plaintiff to get in touch with her gynecologist immediately. Plaintiff returned home but later that day came back to the hospital in severe pain and saw Dr. Tolwinsky in the emergency room who admitted her to the hospital.

Dr. Robert Hoffman, the hospital chief of staff and a board certified general surgeon, was called in consultation by Dr. Tolwinsky and treated plaintiff for a possible bowel obstruction. Plaintiff remained in the hospital for several days being treated conservatively with bed rest, medication and diet until the obstruction relented and she was discharged.

On November 29, 1971, plaintiff again experienced severe pain and saw Dr. Hoffman in the emergency room. He found her bowel was again partially obstructed and advised hospitalization and surgery if necessary but she declined and the condition abated. While plaintiff had no further contact with the hospital and doctors who are defendants herein, she continued to have abdominal discomfort and consulted physicians at the Mayo Clinic in Rochester, Minnesota. Dr. Benjamin Black, a staff physician, performed surgery on her on December 3, 1971, locating a partial obstruction of that part of the small intestine known as the ileum which he stated had been caused by adhesions forming at a previous surgical site. Dr. Black, who testified by evidence deposition, stated that an anastomosis, which is a joining by surgery of two portions of the bowel, had previously been done at that place and he also noted a small hole in the bowel which was sealed off by surrounding structures and adhesions. He corrected the conditions which he found and noted unusual inflammation at the site of the previous surgery which he attributed to the individual reaction of the patient to surgery. Dr. Black also testified that adhesions can result from any bowel surgery and he expected them after surgery performed by himself. He stated that they cause small bowel obstructions as experienced by the plaintiff. Plaintiff was discharged by Dr. Black on December 16, 1971, and he did not see her again.

Over the following years plaintiff experienced discomfort and consulted with several physicians. In June 1972 she again suffered an incomplete abortion and a dilation and curettage was performed at the Mayo Clinic. In 1974 plaintiff and her husband resided in Columbus, Ohio, and there she saw Dr. Anthony Neri, a gynecologist, who testified he performed exploratory surgery and found adhesions involving the

large and small intestines which had become attached to her uterus, tubes and ovaries. He attributed the condition to infection, inflammation, surgical reaction and healing and stated it could be related to the perforation of the bowel and uterus plaintiff had sustained in 1971 or to the subsequent surgery performed by Dr. Black later that year. Dr. Neri noted the existence of fibroid tumors in the uterus and large cysts on both ovaries which conditions he testified could occur naturally. To relieve her symptoms he performed a complete hysterectomy; he last saw plaintiff in 1975 when she had no further symptoms. Plaintiff testified that she had had previous abdominal surgery at age 20, an appendectomy and removal of an ovarian cyst. She also had sustained numerous miscarriages during her first marriage.

Prior to trial Doctors Tolwinsky and Sipos entered into a loan-receipt agreement for the sum of $70,000 which plaintiff would be obliged to repay in the event she recovered from other defendants. At the close of plaintiff's case the trial court granted motions of defendants St. Therese Hospital and Doctors Steiner, Schwarz, Mintz and Hoffman for directed verdicts in their favor and a similar motion made by Dr. Pessis was denied. The jury returned its verdict finding for defendant Dr. Pessis and against plaintiff and the court entered judgment on that verdict.

## I.

■■ Plaintiff contends that the trial court erred in allowing motions for directed verdicts on behalf of defendants St. Therese Hospital, Dr. Robert Hoffman and Dr. Victor Steiner. We must then determine whether the evidence, when viewed in its aspect most favorable to plaintiff, so overwhelmingly favors each defendant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) As noted in *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301, 304-05:

> "Except in certain limited situations not pertinent here, * * * the plaintiff, by the use of expert testimony, must establish the standards of care against which the defendant doctor's conduct is measured. The plaintiff must then further prove by affirmative evidence that, judged in light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused the injury to the plaintiff. [Citations.]"

In regard to the conduct of a defendant hospital in a malpractice action it is the

> "* * * plaintiff's obligation to prove that the hospital failed to comply with the standards of proper care which guide institutions holding themselves out as devoted to the care and saving of human life, and that this failure resulted in the injury or ill-being

complained of. *Scardina v. Colletti*, 63 Ill. App. 2d 481, 211 N.E.2d 762." (*Ybarra v. Cross* (1974), 22 Ill. App. 3d 638, 644-45, 317 N.E.2d 621, 626.)

We will consider the evidence presented as to each of these defendants in light of these rules.

## St. Therese Hospital

Plaintiff's complaint charged the hospital was negligent in that it:

(1) permitted a physician to perform an operation without first examining his qualifications;

(2) disregarded its own bylaws in that it failed to use the degree of supervision over said physicians which its said bylaws indicated must be exercised;

(3) failed to review, at periodic intervals, the surgical and medical skills of the seven defendant doctors herein;

(4) carelessly and negligently failed to provide basic and efficient care to the plaintiff, contrary to the rules of the Illinois Department of Public Health; and

(5) otherwise, carelessly and negligently failed to supervise the performance of the medical practitioners making use of its facilities.

In support of these allegations plaintiff introduced in evidence the hospital bylaws and rules and regulations which had been approved by the governing board of the hospital corporation and which regulate its operation. These establish that a medical records committee consisting of the members of the active medical staff has a duty to supervise such records to assure they are maintained at the required standard. The bylaws also provide for a credentials committee which has a duty to evaluate, review and supervise the medical staff and the courtesy privileges extended to other doctors in using the hospital facilities. Plaintiff argues that there were issues of fact for the jury: whether the hospital, in disregard of its bylaws, failed to adequately review and supervise her treatment by Dr. Pessis; whether his report of the surgery he had performed upon her was accurate; and whether the hospital had properly examined Dr. Pessis' qualifications to perform surgery. Plaintiff suggests, too, that the hospital failed to follow the dietary instructions given by the doctors after her surgery.

While the hospital's bylaws may properly be introduced in evidence on the issue of the standard of care it owes to its patients (*Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, *cert. denied* (1966), 383 U.S. 946, 16 L. Ed. 2d 209, 86 S. Ct. 1204), plaintiff still has the burden of establishing a violation of such

standards proximately causing her injury (*Ybarra*, 22 Ill. App. 3d 638, 644-45, 317 N.E.2d 621, 626). Plaintiff offered no evidence that any of the hospital bylaws or regulations had been violated in her care and treatment. In an effort to meet that burden plaintiff points to the report of surgery made by Dr. Pessis in which he described the operation he performed on her as the repair of a "rent" of her bowel and compares it to the statement of Dr. Benjamin Black in his evidence deposition which described that work as an "anastomosis." Plaintiff concludes the hospital thereby failed to conform to the standards established by its bylaws in that it failed to make an honest and accurate report of surgery as thereby required. In view of the obvious fact that the bylaws require the surgeon to report on that which he did in performing surgery and to file it in the hospital records, it is difficult for us to determine how the hospital could have verified the accuracy of Dr. Pessis' report except by further surgery. The record discloses that the surgery performed by Dr. Pessis in this case, as reported by him, was in fact reviewed by the appropriate hospital committee. It is further apparent from the testimony of Dr. Pessis that his reference to a "rent" and Dr. Black's reference to an "anastomosis" refer to the same repair of plaintiff's bowel and amounts to no more than a different choice of medical terms by the doctors. Plaintiff argues further, in a most general way, that the hospital failed to adequately review and supervise Dr. Pessis' care and treatment of her and failed to properly examine Dr. Pessis' qualifications to perform surgery in the hospital. No evidence was presented, expert or otherwise, relating to either argument. The record does disclose that Dr. Pessis was a physician and surgeon who had been on the staff of defendant hospital for some 29 years. One-third of his practice consisted of surgery of the bowel and, before being granted staff privileges, his credentials had been considered and accepted by the credentials committee after the recommendation of the executive committee of the medical staff. Dr. Pessis had had the privilege to admit patients into the hospital since 1946 and was authorized to perform the surgery with which we are concerned in this case. Plaintiff offered no contrary evidence and we do not believe she met her burden of establishing a violation by the hospital of its standards.

A further question of negligence argued by plaintiff as it relates to the defendant hospital refers to the "soft diet" called for by the physician's instructions after her surgery. It appears that several days later she was given a meal including roast beef which she consumed. No medical evidence was presented relating the temporary abdominal discomfort experienced by plaintiff after that meal to the condition of which she now complains. Again plaintiff has not met her burden.

Plaintiff does not argue and we see no evidence in the record in support of the remaining allegations of negligence in her complaint directed

against this defendant. Finding as we do that no evidence was presented that St. Therese Hospital violated a standard of care owed to plaintiff, the directed verdict in its favor was properly entered.

## Dr. Ronald Hoffman

Plaintiff's case against this defendant is based upon her argument that he negligently failed to diagnose a "pelvic abscess" during his initial examination of her on November 9, 1971. Dr. Hoffman had been called into the case that day by Dr. Tolwinsky as a consultant to assist Dr. Tolwinsky, who was a gynecologist, in treating a suspected incomplete bowel obstruction suffered by plaintiff. They examined her, ordered X rays and other tests and made a diagnosis that her discomfort was a result of a partial bowel obstruction and noted also the presence of a fungus infection of the vagina. Dr. Hoffman directed his efforts to the conservative treatment of the obstruction and it relented without surgery by November 12. Dr. Tolwinsky directed his efforts to plaintiff's general physical condition as her treating physician. Dr. Mandel Schwarz, a radiologist at the hospital, testified that a pelvic abscess would have been seen by X ray, if present, but that there was no evidence of such condition in the X rays taken from November 9 through the 15 which he had examined. Nor did any of the other tests during this period reveal evidence of infection in the pelvic region until November 15 when a blood test first suggested the presence of some kind of infection therein. Plaintiff was treated for it and she was discharged from the hospital on November 23.

No expert testimony was presented by plaintiff suggesting Dr. Hoffman's treatment of her failed to conform to medical standards. She relies instead on Dr. Tolwinsky's observation that on November 22 he found evidence that plaintiff then had a subsiding pelvic abscess. Dr. Tolwinsky reached that conclusion by comparing previous examinations, temperature reduction and a blood count reduction occurring over a period of days. From this plaintiff concludes that she had a medical condition which Dr. Hoffman negligently failed to detect and treat on his initial examination of her on November 9. She contends that a requisite standard of diagnosis was established by Dr. Tolwinsky by the fact that he found a subsiding infection of a type Dr. Hoffman had overlooked.

Although a number of physicians testified during the trial of this case, including Dr. Robert Berman, plaintiff's medical expert, none were called upon to express an opinion as to any diagnostic medical standard which might be pertinent to this issue. The infection noted by Dr. Tolwinsky was located in the urinary tract, an area over which he as a gynecologist had primary responsibility. There was no expert testimony that Dr.

Hoffman was negligent in failing to diagnose that source of infection before Dr. Tolwinsky did so. We find the trial court correctly directed the verdict in Dr. Hoffman's favor.

## Dr. Victor Steiner

Dr. Steiner did not treat plaintiff during her first hospitalization but had met her then in the hospital as a patient of his associate, Dr. Pessis. On her discharge from the hospital on October 16 plaintiff was informed by Dr. Pessis that he was no longer on her case and that she should call Dr. Tolwinsky or Dr. Sipos, her gynecologists, if she had any problems. On October 25, however, plaintiff suffered abdominal discomfort and although she had an appointment for later that day to see Dr. Sipos, she attempted to reach Dr. Pessis by telephone. Dr. Steiner took the call in the office and informed plaintiff that he could not see her and referred her to her gynecologist. She saw Dr. Sipos that afternoon and was given a prescription by him. Dr. Steiner did examine plaintiff in the emergency room of the hospital on November 9 when neither Dr. Tolwinsky or Dr. Sipos were available and referred her to her physician.

Plaintiff argues first that Dr. Steiner, as a "partner of Dr. Pessis," was liable for his torts. The evidence, however, is that both Steiner and Pessis were employees of a professional corporation and were not partners. In that capacity they sometimes assisted one another with patients and Dr. Steiner did meet plaintiff during her hospitalization by that means. As plaintiff has not chosen to furnish any citations of authority or argument beyond her general conclusion that a vicarious liability existed, we will not consider this issue any further.

Plaintiff next contends Dr. Steiner had a duty to follow through and see that she had further care and treatment after he had noted some indication of infection during his examination of her in the hospital emergency room on November 9. Dr. Steiner had examined her when she was unable to reach her physician, Dr. Tolwinsky. He gave her a prescription and referred her to her own physician whom she saw later that day. Plaintiff has, however, presented no expert testimony suggesting that Dr. Steiner's emergency treatment of her in the absence of her physician imposed a duty upon him to personally follow her case thereafter particularly since she saw her regular physician that same day.

The only evidence presented of a possible breach of duty by Dr. Steiner related to his telephone conversation with her on October 25. Plaintiff's medical expert, Dr. Berman, testified that, in his opinion, Dr. Steiner had a duty to see plaintiff when she called him on the telephone on that day and should have done so in the hospital emergency room or office in order to determine if she had a bowel obstruction, infection or

other complaint. Plaintiff argues that the standard of care due plaintiff by Dr. Steiner on that occasion was thus established by Dr. Berman's testimony and that such standard was violated.

We note first that Dr. Berman did no more than express an opinion that Dr. Steiner "should" have seen the patient when she called him but that he did not state there existed an established standard of medical care requiring the doctor to do so under the circumstances described in the hypothetical case presented to Dr. Berman. It would be difficult for us to understand that such a standard might exist given the circumstance that neither Dr. Steiner nor his associate Dr. Pessis were plaintiff's treating physicians on October 25, that she already had an appointment with her physician when she talked on the telephone to Dr. Steiner that day and that she was in fact examined by her physician later that day.

■■■ Dr. Berman gave no basis for his opinion and no explanation of why Dr. Steiner had a duty to see plaintiff on this occasion. The bare opinion of a medical expert unsupported by reason is entitled to little weight. (*Manion v. Brant Oil Co.* (1967), 85 Ill. App. 2d 129, 136, 229 N.E.2d 171, 175.) In addition, there was no testimony, expert or otherwise, as to what injury was proximately caused the plaintiff as a result of not having been seen by Dr. Steiner pursuant to her telephone conversation with him. Were we to find that Dr. Berman's testimony established a medical standard, which we do not, then no evidence was presented that any injuries to plaintiff resulted from a negligent failure to conform to such a standard. (See *Comte v. O'Neil* (1970), 125 Ill. App. 2d 450, 261 N.E.2d 21.) Accordingly, since there was no expert testimony that Dr. Steiner's conduct violated the proper medical standard of care, the directed verdict in his favor was also correct under the *Pedrick* rule.

## II.

Plaintiff next contends that prejudicial errors occurred which require that a new trial be granted.

Plaintiff contends it was error for the trial court to inform the jurors that defendant, Dr. Benjamin Pessis, was absent during a portion of the trial because his wife had died.

The trial commenced March 27, 1975, and on April 8, during its course, the trial court was advised that Mrs. Pessis had died. At this point Dr. Pessis had been called as a witness for the plaintiff and had testified extensively under section 60. He was excused and remained away from the trial for several days before returning to the courtroom. Discussion took place between counsel and the court as to the best way to handle this development. The court considered the fact that Dr. Pessis was not then the only party in the case, as plaintiff was still proceeding against Doctors

Steiner, Schwarz, Mintz, Hoffman and St. Therese Hospital. In addition, 13 witnesses had already testified and the evidence depositions of 2 additional witnesses had been read to the jury. The court determined that the trial would proceed in Dr. Pessis' absence with the expectation that he would be able to appear on his own behalf later in the trial.

Counsel for Dr. Pessis suggested that the court inform the jury of the reason for his absence. Plaintiff's counsel objected stating that no reference to the wife's death should be made in the presence of the jury because sympathy and prejudice for that defendant would necessarily result to the prejudice of plaintiff. The court noted that the jury was not sequestered, that these matters would almost certainly be seen by them in the press as the doctor and his wife were residents of Lake County and that he did not see how the information could be kept from them in any event. The judge then informed the jury that Dr. Pessis was absent from the trial because his wife had passed away and that he would return to testify in a few days.

Plaintiff refers us to cases pointing out that the trial judge is the dominant figure in a courtroom and should be most careful not to make any state ment which could prejudice the jury (*Heiser v. Chastain* (1972), 6 Ill. App. 3d 552, 285 N.E.2d 601) and suggests that the "calculated and deliberate" comment by the trial judge had that effect. She also argues that the trial judge must refrain from any remarks calculated to influence the minds of the jury to the prejudice of a litigant and suggests that the "gratuitous" remark by the court was one which grew out of his personal knowledge and was not a fact in evidence and for that reason, also, was clearly reversible error. (*Johnson v. Johnson* (1975), 34 Ill. App. 3d 356, 340 N.E.2d 68.) In further support of this claim plaintiff refers us to the general rule that in an action for personal injury, where family support is not in issue, mention of a plaintiff's spouse and children is often so irrelevant and prejudicial as to constitute reversible error. *LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 343 N.E.2d 65.

■■ We do not believe, however, that any of the alternate lines of authority suggested by plaintiff are pertinent to the unusual situation presented in this case. It is very clear to us that the information imparted to the jury by the trial judge was not calculated to arouse sympathy for any party nor to enhance damages (see *Jones & Adams Co. v. George* (1907), 227 Ill. 64, 81 N.E. 4), but was simply an effort by the trial judge to permit the trial to continue and complete its long course without prejudice to any party. The trial court met this problem by means which seemed appropriate to it at the time it arose and with an expectation that the jurors would in any event learn of the reason for Dr. Pessis' absence from the courtroom. While it may have been preferable for the trial court

simply to have informed the jurors that the doctor was temporarily absent from the courtroom for personal reasons, we do not believe the approach taken in this instance realistically caused prejudice to plaintiff and it does not require a new trial. Plaintiff has cited no authority mandating such a result.

Plaintiff contends that counsel for defendant Dr. Pessis made improper use of the loan-receipt agreement entered into between plaintiff and Doctors Tolwinsky and Sipos.

■■ At the commencement of the trial the existence of a loan-receipt agreement was made known to the court and counsel whereby those defendants were dismissed from the case for the sum of $70,000 paid to plaintiff. That agreement also provided that any sums recovered by plaintiff from the remaining defendants, up to the amount of the loan, would be payable to the insurer of these dismissed defendants. Plaintiff objected to the admission in evidence of the agreement solely on the grounds of relevancy in that Dr. Tolwinsky, who was called as a witness by plaintiff, had no personal interest in the outcome of the case as his insurance carrier, not he, would benefit from any recovery made by plaintiff. The trial court, correctly relying upon *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, 303 N.E.2d 382, admitted the agreement in evidence. *Reese* recognized that, where a defendant has entered into such an agreement with a plaintiff and is dismissed from the action while plaintiff proceeds against the remaining defendants, questions of motive and credibility of witnesses might arise if the dismissed defendant or his employees are thereafter called as witnesses by plaintiff. In the usual case any recovery by that defendant of the sum loaned to plaintiff is contingent upon plaintiff's success against the remaining defendants. The court in *Reese* found that the remaining defendants could be adequately protected, however, if by cross-examination of such witness they were permitted to show that he knows of the loan agreement and, if so, that he may be biased and it further suggested that an explanatory instruction could be given if requested by any party. The court carefully limited evidence of the loan agreement to issues of motive and credibility of such witnesses and stated it was not to be considered relative to issues of either liability or damages. See also *Casson v. Nash* (1977), 54 Ill. App. 3d 783, 370 N.E.2d 564; *Gatto v. Walgreen Drug Co.* (1975), 61 Ill. 2d 513, 523, 337 N.E.2d 23, 29, *cert. denied* (1976), 425 U.S. 936, 48 L. Ed. 2d 178, 96 S. Ct. 1669.

In this case counsel for defendant St. Therese Hospital, by cross-examination of Dr. Tolwinsky, demonstrated the doctor's knowledge of the loan-receipt agreement. In closing argument, however, counsel for Dr. Pessis saw fit to state to the jury that plaintiff made a deal with Doctors Tolwinsky and Sipos for $70,000 and, while Dr. Sipos was solely

responsible for injury to plaintiff, she had let him and his employer, Dr. Tolwinsky, out of the case. He went on to say:

> "So, I am suggesting, who knows better than anybody else? They must know something we don't know, otherwise, why should she accept only $70,000 from a person who is absolutely liable? Why should she?"

He further argued that plaintiff would not have taken the $70,000 if she didn't believe she was getting the full amount due to her.

The argument was clearly erroneous in relating the loan agreement to issues of both liability and damages contrary to the limitations placed upon it by the court in *Reese*. It is difficult to understand why counsel was willing to jeopardize a three week trial by such overreaching. It is equally difficult, however, to understand why plaintiff's counsel neither objected to the argument nor tendered an instruction limiting the application of the loan-receipt agreement to the pertinent issues of the case. Plaintiff's argument that she repeatedly objected to the misuse of the loan-receipt agreement by defendants is not born out by the record. And her further argument that since the agreement had been admitted in evidence it was a predictable and foregone conclusion that the trial court would overrule any objection plaintiff might make to defendant's closing argument is similarly unconvincing. While plaintiff suggests that she could not reasonably hazard another objection, the rules require her to do so in order to preserve this issue for appeal. In the absence of objection, the possible prejudicial effects of objectionable argument may be waived on appeal (*Taylor v. Carborundum Co.* (1969), 107 Ill. App. 2d 12, 246 N.E.2d 898; *Copeland v. Johnson* (1965), 63 Ill. App. 2d 361, 211 N.E.2d 387) and we so find here.

Plaintiff next contends the trial court erred in allowing improper testimony by Dr. Hoffman and unduly restricting her counsel's examination of witnesses.

■■ Plaintiff's contention that Dr. Hoffman should not have been permitted to testify when called by defendant as an expert witness, as he was not included in defendants' response to plaintiff's interrogatory requests for the names of all expert witnesses, is not supported by the record. The response, filed before trial on behalf of Dr. Pessis, stated that "it is the intention of this defendant to rely upon the expert testimony of parties to this litigation." Dr. Hoffman was such a party, his discovery deposition was taken by plaintiff prior to trial and he was also called as a witness and extensively examined by plaintiff under section 60.

We find no error in this regard. Plaintiff was informed Dr. Hoffman could be called by defendant as an expert witness, although he was not mentioned by name, and she cannot now properly claim that surprise or prejudice which the discovery rules seek to avoid.

■■ Plaintiff contends the trial court improperly admitted Dr. Hoffman to testify that it was his opinion, based on his review of Dr. Pessis' surgical report and conversations with him, that Dr. Pessis complied with ordinary medical standards in treating her. Plaintiff now asserts the area of inquiry should have been reached by a hypothetical question posed to Dr. Hoffman (*Danielson v. Elgin Salvage & Supply Co.* (1972), 4 Ill. App. 3d 445, 280 N.E.2d 778; *Schwartz v. Peoples Gas Light & Coke Co.* (1962), 35 Ill. App. 2d 25, 181 N.E.2d 826), but in trial she made only a general objection to the question propounded to Dr. Hoffman without stating any basis for it and, therefore, has not preserved her present claim of error for review. *People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817; *Shepard v. City of Aurora* (1955), 5 Ill. App. 2d 12, 124 N.E.2d 584.

Plaintiff contends further that the trial court improperly restricted her counsel's examination of Doctors Hoffman and Pessis, to her prejudice, while permitting defendants' counsel a broader scope of inquiry of these witnesses. We have considered the rulings made by the trial court of which plaintiff complains and find no prejudicial error requiring a new trial. The scope of the cross-examination of witnesses is within the sound discretion of the trial judge (*Piechalak v. Liberty Trucking Co.* (1965), 58 Ill. App. 2d 289, 208 N.E.2d 379) and we find no substantial abuse of such discretion in this instance.

■■ Plaintiff contends she was prejudiced by defendants' failure to produce certain records she had requested before trial pursuant to Supreme Court Rule 237 (Ill. Rev. Stat. 1971, ch. 110A, par. 237).

The records which plaintiff asserts were not provided to her are the report of surgery made by Dr. Pessis relating to plaintiff, the dietary manual in use by St. Therese Hospital during her stay there and written statements given by certain nurses to defendants relating to this matter. Plaintiff argues that the trial court should have imposed sanctions on defendants for their failure to abide by the discovery rules.

The record discloses that the report of surgery to which plaintiff refers was contained in the hospital records furnished to her prior to trial and her counsel apparently utilized that report in his section 60 examination of Dr. Pessis. The entire hospital record, including the report, was admitted in evidence and is found in the record of this case. The dietary manual in force in October 1971, at the time of plaintiff's initial hospitalization, had been replaced by another such manual at some time later. Prior to trial plaintiff took the deposition of Sister Jilk, the head dietitian at St. Therese Hospital, who testified that the portion of the former manual defining "soft diets," in which plaintiff was interested, was identical to that found in the current diet manual which had been furnished to her. During trial, counsel for defendant hospital secured a copy of the former diet manual and provided it to plaintiff during her case in chief. As represented by

Sister Jilk, the soft diet menu of each manual was identical. Plaintiff does not identify in her initial brief the nurses whose statements she asserts were not received by her; in her reply brief, however, she refers to nurses Kincaid and White and concedes their statements were provided after the trial began. While the statement made by nurse Kincaid was apparently overlooked by counsel for defendant hospital prior to trial and not provided to plaintiff until shortly before that witness testified, plaintiff's counsel did have it in his possession for use in examination of the witness. As to nurse White, who at trial was called as plaintiff's witness, counsel for defendant hospital again apparently overlooked an earlier statement given by that witness in 1972 relating to this matter. He stated he did not locate it until after the witness had testified and he did then furnish it to plaintiff's counsel while her case in chief was still proceeding. A comparison of that statement with the testimony of the witness discloses no differences of substance. In fact, nurse White testified in greater detail in trial than in the statement.

While plaintiff claims prejudicial surprise because defendants did not carefully abide by the rules of discovery in these matters, we do not believe that position has support in the record. Nor does the failure of defendants to comply with the discovery rules which we have described warrant granting plaintiff a new trial under these circumstances. *Anderson v. City of Chicago* (1975), 29 Ill. App. 3d 971, 331 N.E.2d 243.

Plaintiff further contends the trial court erred in refusing to admit in evidence photographs of her scars for the consideration of the jury.

■■ It is well established that photographs of injuries are permitted in evidence when they might be helpful to an understanding of the facts, are material, accurate and correctly portray that which they purport to show. (*LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 1024, 343 N.E.2d 65, 84.) In this case, however, the record discloses plaintiff had undergone abdominal surgery on two occasions before those which are the subject of this litigation and that the scars attributable to the procedures being considered by the jury in this case were described in great detail by the medical witnesses through examination by her counsel. The trial court did not abuse its discretion in denying admission of the exhibits in this instance. *Darling v. Charleston Community Memorial Hospital* (1964), 50 Ill. App. 2d 253, 200 N.E.2d 149, *aff'd* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, *cert. denied* (1966), 383 U.S. 946, 16 L. Ed. 2d 209, 86 S. Ct. 1204.

Plaintiff argues the trial court abused its authority by requiring plaintiff's counsel to furnish the court and defendants' counsel with copies of a draft of hypothetical facts which plaintiff proposed to offer in evidence and upon which the hypothetical questions posed to plaintiff's expert medical witness would be based.

The court wished to conduct a hearing in chambers to consider any objections which might be interposed to plaintiff's version of the hypothetical facts to settle them there rather than proceeding directly before the jury with the interruptions of numerous objections which might be expected. Plaintiff describes the court's action as arbitrary and impermissible interference with the conduct of her case, but she also correctly concedes there might be some merit in this procedure in order to avoid confusion such as arose in *Borowski v. Von Solbrig* (1973), 14 Ill. App. 3d 672, 686-89, 303 N.E.2d 146, 156-59, *aff'd* (1975), 60 Ill. 2d 418, 424-40, 328 N.E.2d 301, 305-08.

A hearing was held outside the presence of the jury in which the assumed hypothetical facts proposed by plaintiff for submission to her witness were considered, objections received and ruled upon and the form in which those hypothetical facts would be given settled on the record by the trial court. We note that the statement in its final form when read to the expert witness in the presence of the jury by plaintiff's counsel required 49 pages of the transcript. No interrupting objections were interposed, nor were restatements or changes in the hypothetical facts required to be made before the jury when presented to the witness. We believe this to have been an exemplary process to follow in this case. (See 3 Goldstein, Trial Technique §18.04 (2d ed. Supp. 1977).) A trial court necessarily has a substantial degree of discretion in its handling of the proceedings during the trial of a lawsuit. (*La Salle National Bank v. Wieboldt Stores, Inc.* (1965), 60 Ill. App. 2d 188, 208 N.E.2d 845.) We find no abuse of that discretion here. In addition, we note plaintiff made no formal objection to the request of the court in this instance and cannot now claim error. *Bohannon v. Schertz* (1974), 21 Ill. App. 3d 149, 315 N.E.2d 316.

In this connection, plaintiff further contends the trial court unduly restricted her expert medical witness, Dr. Robert Berman, from expressing his opinion on the issues of negligence in this case. While defendants made no objections to the hypothetical facts to be considered by the witness in expressing his opinion, they did object to the form of certain hypothetical questions posed by plaintiff to the witness. These objections were directed to the form utilized by counsel in seeking Dr. Berman's opinion whether, based upon the hypothetical facts, Dr. Pessis possessed and applied the knowledge and used the skill and care ordinarily used by reasonably well qualified doctors in the locality in which he practiced in his treatment of plaintiff. While the trial court did sustain defendants' objections to the form of the initial questions propounded in this regard the witness was permitted to respond to revised questions relating to that issue and did so. We find plaintiff was not unduly restricted in her examination of her witness.

Finally, plaintiff urges us to consider that she does not waive any of the 76 points of error assigned by her in her post-trial motion although she has discussed only certain of them in her brief. She suggests that the unusual number of points of error assigned in that motion cumulatively establish that plaintiff did not receive a fair and impartial trial and that a new trial should be ordered on that ground, too.

■■ Issues raised in a post-trial motion are deemed waived if not argued in appellant's brief (Ill. Rev. Stat. 1975, ch. 110A, par. 341(e)(7); *Sheley v. Guy* (1975), 29 Ill. App. 3d 361, 366-67, 330 N.E.2d 567, 571, *aff'd* (1976), 63 Ill. 2d 544, 348 N.E.2d 835) and such matters will not here be considered further by us.

For the reasons we have discussed the judgment of the trial court will be affirmed.

Affirmed.

GUILD and RECHENMACHER, JJ., concur.